**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Samuel Randolph BOONE,**
**Defendant–Appellant.**

**No. 91–8417.**

United States Court of Appeals,
Eleventh Circuit.

May 5, 1992.

Rehearing and Rehearing En Banc
Denied June 15, 1992.

---

Charles T. Erion, Erion & Exum, Macon, Ga., for defendant-appellant.

Paul C. McCommon, III, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

Before FAY and EDMONDSON, Circuit Judges, and ATKINS *, Senior District Judge.

FAY, Circuit Judge:

This appeal arises from the conviction of the defendant-appellant, Samuel Randolph Boone, in the United States District Court for the Middle District of Georgia. The defendant challenges his convictions under the Federal Kidnapping Act and the Dyer Act, arguing that his federal prosecution was barred by prosecutorial delay in the state courts of Georgia and that his actions did not violate the Federal Kidnapping Act. For the reasons that follow, we AFFIRM IN PART, REVERSE IN PART, and REMAND for a new trial.

## I. BACKGROUND

### A. *Factual History*

On July 31, 1985, Jonathan Mark Wood left his home in Scottsboro, Alabama to look for work in Jacksonville, Florida. His wife expected him home on either August 1 or August 2. During his stay in Jacksonville, however, Wood met defendant-appellant Samuel Randolph Boone. As a result of this encounter, Wood never made it back to his home and family.

Wood met Boone in Jacksonville on August 1, 1985. According to statements Boone made to authorities, the two men drank together and used drugs during that afternoon and evening. Boone further revealed that he again encountered Wood on the following day, after seeing Wood asleep in his maroon Toyota Corolla. Boone admitted that he then induced Wood to travel with him to Georgia, falsely telling Wood of a marijuana patch in Georgia. The two men left for Georgia and the nonexistent marijuana patch, Boone having taken the wheel of Wood's Toyota.

On their way to the marijuana patch, Boone and Wood stopped for fuel and beer on Interstate 10. Boone again took the wheel. The car trip continued across the

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

Florida–Georgia line and came to an end in a remote rural location outside of Fargo, Georgia, not far from Boone's father's residence. Boone and Wood proceeded on foot into the surrounding wooded area where Boone "borrowed" Wood's lock blade Case knife. After walking some distance into the woods, Wood realized that he had been deceived into believing that a marijuana patch existed. Boone then stabbed Wood in the chest two times and slit Wood's throat. While Wood was still alive, Boone tied Wood's hands and feet, leaving him to die where it was unlikely that he would be found.

After fatally wounding Wood and tying him up, Boone returned to Wood's parked car with Wood's personal possessions. He then drove to his father's nearby trailer home, bathed, got his hair cut, and left tools and a tool belt that belonged to Wood. Shortly thereafter, Boone was back in Wood's car, driving to North Carolina.[1]

On August 16, 1985, Boone was arrested in Nash County, North Carolina on charges unrelated to this case. He was carrying Wood's lock blade Case knife and wallet. Among other things, the wallet still contained photographs of Wood's wife and son, Wood's credit cards, and receipts for fuel that had been purchased after August 3, 1985 with Wood's credit cards.

On September 16, 1985, Boone informed authorities in Nash County, North Carolina of the locations where Wood's body and automobile could be found. Although a search soon recovered Wood's Toyota, the initial search for Wood's body failed to uncover anything in the densely wooded area near Fargo. Boone then spoke to his father by telephone and described the specific location of Wood's body. With that information, Boone's father was able to lead authorities to Wood's remains.

On October 1, 1985, Boone gave a sworn statement to the Nash County Sheriff's Department in the presence of his mother. In that statement, Boone recounted the events surrounding the death of Jonathan Mark Wood.

## B. *Procedural History*

On March 6, 1986, a grand jury of the Superior Court of Clinch County, Georgia indicted Samuel Randolph Boone for two state offenses: the murder of Jonathan Mark Wood and the accompanying thefts by taking. Shortly thereafter, the District Attorney for the Alapaha Judicial Circuit filed a detainer against defendant Boone with the North Carolina Department of Corrections.[2]

Due to this detainer, Boone requested that Georgia authorities bring him to trial on the Clinch County, Georgia indictment. That request, received by the district attorney on May 5, 1986, activated the Interstate Agreement on Detainers, *see* O.C.G.A. § 42–6–20, and required that Boone stand trial in Georgia by October 5, 1986. Failure to comply with the Act's deadline would result in a dismissal of the indictment with prejudice.

Despite these consequences, Boone was not brought to trial within the prescribed time period. The Georgia authorities obtained a superseding indictment against Boone on March 16, 1987, but the two state court indictments were dismissed with prejudice on February 28, 1989 in an "Order of Nolle Prosse." On May 3, 1989, the North Carolina Department of Corrections removed the detainer against Boone.

The record reveals that the United States first learned of Boone's acts in December of 1989. A federal investigation ensued, and on June 28, 1990, a federal grand jury returned a two count indictment charging Boone with a violation of the Federal Kidnapping Act, 18 U.S.C. § 1201 (also known as the Lindbergh Kidnapping Act), and a violation of the Dyer Act, 18 U.S.C. § 2312.

---

1. Notably, although Boone left Florida lacking the means with which to travel beyond Georgia, he had told his aunt on that very day that he planned to travel to North Carolina. With Wood's car, Boone was able to complete that journey.

2. As a result of unrelated criminal charges, Boone was already serving a prison sentence in North Carolina when he was indicted in Georgia. He currently remains incarcerated in North Carolina.

Boone filed a Motion to Dismiss Indictment, claiming that the federal indictment was barred by the Interstate Agreement on Detainers Act, 18 U.S.C. App. II, and the Fifth, Sixth, and Fourteenth Amendments. That motion was denied. In addition, both the defendant and the government filed motions focussing on the legal requirements of the Federal Kidnapping Act, 18 U.S.C. § 1201. The district court granted the government's Motion in Limine and denied the defendant's Request to Charge.

On February 26, 1991, Boone was tried and convicted by a jury on both counts of the federal indictment. On May 7, 1991, Boone received a life sentence on Count I (kidnapping) and a five-year sentence on Count II (transporting a stolen vehicle in interstate commerce). The five-year sentence for Count II was to run consecutively to the life sentence for Count I. On May 13, 1991, Boone filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Boone argues that the district court committed error when it denied his Motion to Dismiss Indictment. Boone also contends that the district court erred in its interpretation of the Federal Kidnapping Act, thereby committing a number of errors requiring the reversal of his conviction.[3]

### A. *Motion to Dismiss Indictment*

Boone argues that the federal indictment which led to his conviction should have been dismissed in accordance with the Interstate Agreement on Detainers Act and the Fifth, Sixth, and Fourteenth Amendments. His argument rests on the delay of Georgia authorities in bringing him to trial after the initial March 6, 1986 indictment was returned against him in the Superior Court of Clinch County, Georgia. He contends that the pendency of the state court indictment and the delay by Georgia authorities should prevent a subsequent federal prosecution arising from the same events.

■ Under these circumstances, however, the Interstate Agreement on Detainers Act has not been violated or circumvented by federal authorities. Boone has never been tried in the state courts of Georgia, and he has never been convicted of violating Georgia law. Instead, he was tried in the United States District Court for violations of federal law. The Georgia indictments brought within the Act have been properly dismissed with prejudice, thereby safeguarding Boone from a later prosecution under Georgia law for the capital offense of murder and for the thefts accompanying that murder. The dismissal of those indictments, however, does not prevent a subsequent federal prosecution. The Act does not create consequences beyond those accompanying the dismissal with prejudice of the particular indictment that was subject to the Act's time constraints. In other words, the Act does not prevent subsequent indictments that would not be barred by the protections against double jeopardy. Furthermore, there have been no allegations that the United States independently violated the Act in its prosecutorial efforts against Boone.

■ Similarly, the Fifth, Sixth, and Fourteenth Amendments do not bar the federal prosecution against Boone. Any arguably improper or unconstitutional delay in the prosecution of Boone was occasioned solely by Georgia authorities. There is no basis here for imputing Georgia's dilatory conduct to the United States or to the federal prosecution. On the contrary, the United States appears to have proceeded in an expedient and timely fashion once it learned of Boone and his actions in December of 1989. The government indicted him on June 28, 1990 and brought him to trial on February 26, 1991. The government acted within the statute of limitations period, and there has been no showing that any

---

**3.** Regardless of the interpretation given to the Federal Kidnapping Act, Boone also argues that there was insufficient evidence to convict him of kidnapping because his inculpatory statements were not corroborated at trial. After reviewing the record, we reject this argument as meritless.

delay was the result of federal authorities seeking advantage.

Under these circumstances, we reject Boone's challenges to his federal indictment and affirm the district court's denial of the Motion to Dismiss Indictment.

## B. *Kidnapping Charge*

Boone next challenges his conviction on the basis of the district court's interpretation of the Federal Kidnapping Act, 18 U.S.C. § 1201. In pertinent part, this statute provides for the following:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
>
> (1) the person is willfully transported in interstate or foreign commerce;
>
> .        .        .        .        .
>
> shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(a)(1). Boone argues that the district court misinterpreted the statute when it granted the government's Motion in Limine and when it instructed the jury. Specifically, Boone argues that his conviction cannot stand because the jury was not instructed that the following findings were necessary for a guilty verdict: (1) that Boone physically held Wood before crossing the Florida–Georgia line, (2) that Wood was not willing to accompany Boone to Georgia, and (3) that the inveigling of Wood must have been "unlawful in and of itself." Finally, Boone argues that there was insufficient evidence for a properly instructed jury to have convicted him of the federal kidnapping offense.

In advancing his position, Boone relies heavily upon *United States v. McInnis,* 601 F.2d 1319 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).[4] In *McInnis,* the Former Fifth Circuit pointed out that the federal kidnapping statute uses comprehensive language " 'to

cover *every possible variety* of kidnapping' " that is followed by interstate transportation. *Id.* at 1324 (quoting *Chatwin v. United States,* 326 U.S. 455, 463, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946)) (emphasis added). The statute does not, however, make *"every* seduction of victims into another state a federal crime," *id.* (emphasis added), for " 'the purpose of the Act was to outlaw interstate kidnapings rather than general transgressions of morality involving the crossing of state lines,' " *id.* (quoting *Chatwin,* 326 U.S. at 463, 66 S.Ct. at 237).

▉ Despite this admonition, the Federal Kidnapping Act remains applicable to kidnappings accomplished solely by the "seduction of victims," *i.e.,* by the inveigling or decoying of kidnapping victims. Any other reading of the Act would read the words "inveigle" and "decoy" out of the statute, a result that recognized rules of statutory construction direct us to avoid. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (recognizing that statutes should be construed so that no part is rendered inoperative); *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1502 (11th Cir. 1991); *United States v. Rawlings,* 821 F.2d 1543, 1545 (11th Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). The Act's reach is limited, however, to inveiglements that amount to kidnapping followed by transportation in interstate or foreign commerce. *McInnis,* 601 F.2d at 1324. Inveigling or decoying someone across state lines is not in and of itself conduct proscribed by the federal kidnapping statute. To determine whether a kidnapping by inveiglement has occurred prior to transportation, a fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed.[5]

---

**4.** Decisions of the Fifth Circuit rendered prior to October 1, 1981 are binding precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**5.** To the extent that the defendant contends an inveiglement must be unlawful in and of itself,

we reject his argument. Inveiglement becomes an unlawful form of kidnapping under the statute when the alleged kidnapper interferes with his victim's actions, exercising control over his victim through the willingness to use forcible action should his deception fail.

Where an alleged kidnapper successfully inveigles or decoys his victim, transports that person in interstate or foreign commerce, and holds the victim for ransom, reward, or otherwise, the mere fact that the kidnapper was not required to physically hold his victim prior to the crossing of state lines, thereby sparing himself the effort of using forcible action to accomplish the kidnapping, does not take his conduct outside of the statute.

This interpretation of the federal kidnapping statute is entirely consistent with *McInnis*. In *McInnis*, the defendants were indicted for, among other things, a conspiracy to kidnap. Under the alleged plan, the defendants were going to lure their victim into travelling alone from Texas to Mexico. *Id.* at 1321. According to the indictment, the defendants had arranged to have their victim kidnapped and killed following his arrival in Mexico. *Id.* Until the victim's arrival in Mexico, however, no kidnapping would take place. *Id.* at 1325. There was simply no intent to unlawfully interfere with the victim's actions until that point. In the event that the victim was not successfully tricked into going to Mexico, the defendants' alleged plan called for no further steps, forcible or otherwise, to kidnap him. The *McInnis* court thus affirmed the dismissal of the indictment because the indictment failed to allege a plan calling for any form of kidnapping prior to the victim's transportation in foreign commerce. *See id.* The court did not rule on the basis that the defendants had not planned to use physical force in perpetrating a kidnapping.

■■■ On the other hand, the evidence in this case reveals that a kidnapping under the statute may indeed have taken place prior to the crossing of the Florida–Georgia line. The mere fact that force was not used prior to the crossing of state lines does not prevent Boone's acts from constituting a kidnapping. Here, Boone inveigled Wood into driving to Georgia and accompanied him on that journey. Boone even drove Wood's vehicle on the trip from Jacksonville, Florida to Fargo, Georgia. At all times, Boone remained in a position where he could use force to ensure the kidnapping and transporting of Wood to the remote site where the murder and theft would take place. Moreover, evidence in the record supports a finding that Boone intended to get Wood to Georgia to murder and rob him there, whether or not forcible action was required to accomplish this. Where an inveiglement occurs and force is held in reserve only because the kidnapper's deception is operating successfully, an unlawful interference with the actions of another has occurred—whether or not that person is aware of the interference— such that a kidnapping and holding has occurred under the statute.

The Supreme Court has stated that "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460, 66 S.Ct. 233, 235, 90 L.Ed. 198 (1946). In the inveiglement situation presented in this case, the restraints imposed upon Wood appear to have had both physical and mental components. These restraints would have resulted from the deception Boone created and from Boone's apparent willingness to use force to keep Wood restrained.[6] Unlike the evidence in *Chatwin*, the evidence in this case strongly suggests that Wood was not "perfectly free to leave the [defendant] when and if [he] so desired." *Id.*

Boone nonetheless contends that he did not violate the federal kidnapping statute because Wood was willing to accompany him from Jacksonville, Florida to the location of the nonexistent marijuana patch in Georgia. Boone argues that Wood's willingness to travel amounts to consent, and that such consent vitiates his conviction. *See United States v. Chancey*, 715 F.2d 543, 546 (11th Cir.1983) ("To be exactly specific, if the interstate transportation is

---

6. The "holding" in this case would therefore have begun with Boone's acts in Florida, acts that amounted to far more than inherent aspects of the murder and thefts occurring in Georgia. *See United States v. Howard*, 918 F.2d 1529, 1534–37 (11th Cir.1990), *cert. denied*, ——

by consent there is no case."); *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968) ("[C]onsent would be a complete defense to a charge under the kidnapping statute....").

Although *Hattaway* and *Chancey* clearly state that consent is a valid defense to kidnapping charges, neither case addresses whether an inveigled person can validly consent to be transported in interstate commerce where the willingness to be transported is the result of the defendant's continuing deception. If the statute viewed an inveigled person's willingness to accompany his kidnapper as consent, then a violation of the statute by inveigling or decoying could only occur where the person was seized, confined, abducted, or carried away by the defendant after an attempt at inveigling or decoying had either failed or been aborted. Inveigling and decoying, which necessarily contemplate obtaining another's apparent but unknowing consent by deception, would not be independently prohibited as means of kidnapping under the statute. Again, the words "inveigle" and "decoy" would be reduced to superfluous statutory language. Such a construction is simply contrary to the plain meaning of the statute.

Yet, the *McInnis* court did state that "the *entirely voluntary act* of a victim in crossing a state line" cannot be a violation of the statute "even though it is induced by deception." *Id.* at 1327 (emphasis added). Although the *McInnis* court noted that the Eighth Circuit had twice held that the federal kidnapping statute proscribed "the decoying or inveigling of a victim to accompany the defendant in interstate commerce," *id.* at 1326, the *McInnis* court also stated that it could not subscribe to the Eighth Circuit's extension of the Act in order to

reach the *entirely* voluntary act of a victim who was induced by deception. *Id.* at 1327. However, the victim in *McInnis* was not supposed to travel with another. He was not to have been continually subjected to a kidnapper's ongoing efforts to maintain the deception and advance the intended kidnapping. In other words, the alleged kidnappers were not going to unlawfully interfere with the *McInnis* victim's actions. Instead, the allegations in the *McInnis* indictment revealed nothing more than that an attempt by the alleged kidnappers to influence their victim's actions; they did not stand ready to use force against their victim, thereby exercising control over him.[7]

■ In contrast, where a kidnapper accompanies his inveigled victim, preserving the deception and intending to use physical or psychological force if necessary, the volition of the victim is undermined beyond mere inducement by deception. The victim is kept from acting in an entirely voluntary manner by the acts, presence, and intent of his inveigling kidnapper. He is ensnared within a net that his kidnapper's deception has prevented him from seeing. In such a situation, the victim's act of accompanying his kidnapper cannot be entirely voluntary and cannot amount to legally valid consent.

### III. CONCLUSION

■ The record in this case reveals that there was indeed sufficient evidence for a properly instructed jury to have convicted the defendant. However, the trial court's instructions to the jury did not make clear that a kidnapping by inveiglement requires the alleged kidnapper to have formed the intent to use forcible action, in the event his deception failed, to complete the kidnapping. In addition, the instructions failed to inform the jury that the kidnapper's intent

U.S. ──, ──, 111 S.Ct. 2240, 114 L.Ed.2d 482 (1991).

**7.** Boone nonetheless contends that *United States v. McRary*, 665 F.2d 674 (5th Cir. Unit B), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1982), is controlling circuit authority supporting his interpretation of *McInnis*. Although this court is indeed bound by *McRary, see Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982) (Decisions rendered by a Unit B panel of the Former Fifth Circuit are binding precedent.), the *McRary* decision does not support the

defendant's interpretation of *McInnis*. The *McRary* decision was primarily concerned with federal jurisdiction over an alleged kidnapping which had begun outside the United States. 665 F.2d at 676–78. The majority opinion clearly reveals that the court's analysis assumed an undisputed fact—the kidnapping began beyond the territory of the United States. *Id.* at 677, 678. The court never analyzed the key issue in this case, *i.e.*, whether any inveigling that may have occurred could have arisen to the level of a kidnapping within the United States.

must have been formed prior to the interstate transportation of the victim. Thus, when the instructions are taken as a whole, it becomes evident that the trial court failed to adequately present the jury with the issues and law governing the defendant's kidnapping charge. *See United States v. Terzado–Madruga,* 897 F.2d 1099, 1122 (11th Cir.1990) (setting forth standard of review). Accordingly, we REVERSE the defendant's conviction on Count I, and REMAND for a new trial in accordance with this opinion solely on Count I. On the other issues raised in this appeal, we AFFIRM both the rulings made by the trial court and the conviction on Count II.